Hon. Robert J. Bryan

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STATE of WASHINGTON, the PUYALLUP TRIBE OF INDIANS, and the MUCKLESHOOT INDIAN TRIBE,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civ. No. 06-05225RJB<br><br><br><br>ORDER |

This matter comes before the Court on Plaintiffs' Motion to Enter Consent Decree. Dkt. 8. The Court has considered the pleadings filed in support of and in opposition to the motion, the parties' briefing, and the remainder of the file therein, and heard oral argument of counsel for the parties and Todd Shipyards Corporation on October 5, 2007.

**I. PROCEDURAL BACKGROUND**

On April 24, 2006, Plaintiffs filed a complaint against the defendant United States in the United States District Court, Western District of Washington at Tacoma. Dkt. 1. Plaintiffs filed an amended complaint on May 25, 2006. Dkt. 6. Plaintiffs seek to recover environmental damages resulting from the release of hazardous substances into Commencement Bay in Tacoma, Washington under section 107(a) of the Comprehensive Environmental Response, Compensation,

and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), and the Model Toxics Control Act ("MTCA"), Wash. Rev. Code 70.105D. *Id.*

On April 24, 2006, Plaintiffs and the defendant United States submitted a proposed consent decree, whereby the United States agreed to pay $12,184,868.80 in natural resource damages, and $1,351,891.53 for its allocable share of the Trustees' past assessment costs. Dkt. 5-2, at 7. The dollar value of the Trustee's claim against settling federal agencies totals $13,536,760.33. *Id.*

Plaintiffs received one comment letter during the notice and comment period objecting to the consent decree, from Todd Shipyards Corporation ("Todd"). Dkt. 8-2. Plaintiffs filed a Motion to Enter Consent Decree on September 12, 2007. Dkt. 8.

## II. FACTUAL BACKGROUND

### A. Contamination of Commencement Bay and Trustee's Response

Commencement Bay is an embayment in southern Puget Sound located in and adjacent to Tacoma, Washington. The Commencement Bay environment includes various bodies of water, shoreline, and other areas. Based on investigations conducted by the Environmental Protection Agency and others, Plaintiffs contend that the Bay is contaminated with a variety of hazardous substances as a result of industrial activities that took place in and adjacent to the Bay environment. Dkt. 6. The contamination has led to serious environmental consequences for the Bay. *Id.*

The Hylebos Waterway ("Waterway") is the northernmost of a set of finger-like waterways in the southeast end of Commencement Bay.[1] During approximately the last 100 years, the land along either side of the Waterway was divided into parcels of land that were put to various industrial uses. During this time period, contaminants generated on these properties

---

[1] While the Commencement Bay environment encompasses bodies of water, shoreline, and other areas, the focus of contamination for purposes of this order is the Hylebos Waterway.

found their way into the Waterway and caused natural resource damage. The number of entities that operated these industries, owned the properties and/or sent wastes to these entities, runs into the hundreds.

Plaintiffs, together with the National Oceanic and Atmospheric Administration ("NOAA") and the U.S. Department of the Interior, are trustees for natural resources under section 107(f) of CERCLA for those affected resources in Commencement Bay. In 1990, the trustees and other government agencies began conducting a natural resource damage assessment ("damage assessment") pursuant to a Memorandum of Agreement ("MOA") entered into by Plaintiffs and other government agencies. Dkt. 9-2. The trustees designated NOAA as the lead trustee. *Id.* The MOA also established a Trustee Council responsible for, among other things, the development of joint positions on how damage assessment claims should be presented, prosecuted and settled. Dkt. 9, at 2. Under the MOA, the Environmental Protection Agency agreed to assist in the coordination of the damage assessment. Dkt. 9-2; Dkt. 9-3.

As part of the damage assessment, the trustees identified parties that were potentially responsible for Commencement Bay's natural resource damage. These parties are referred to as potentially responsible parties, or PRPs. The Trustees developed a process for settling damage assessment claims relating to the Hylebos Waterway. Beginning in early 2002, the Trustees began communicating with Hylebos Waterway PRPs regarding the settlement process. Dkt. 9, at 3. According to Plaintiff, Todd received information from the Trustees regarding the settlement process, and was mailed additional information that included a draft settlement proposal report. *Id.* The record does not indicate what information was included in the draft settlement proposal report.

On April 15, 2002, the Trustees published a notice advising the public that the draft proposal was available for public comment. A technical briefing was held in May 2002, and a

final version of the proposal report was distributed to the PRPs in October 2003.[2] Another meeting was held on October 30, 2003.  According to Plaintiff, no representative of Todd attended either of these meetings, nor did Todd attend a subsequent meeting held in 2004.  In May 2004, the Trustees notified the PRPs of a final deadline for the submission of settlement proposals by PRPs.  According to Plaintiff, Todd did not submit a proposal, and the Trustees wrote to Todd in December 2005 to formally withdraw their settlement offer.  Dkt. 9.

Todd claims to have tendered a defense to the Trustee's claims to the United States on at least two occasions.  Todd sent letters tendering its defense on July 8, 2002, and on May 27, 2004. Dkt. 8-2, at 18, n. 14.  According to Todd, the United States did not respond to Todd's tender.  Dkt. 8-2, at 2.

### B. Trustee's Method of Allocating Liability to PRPs

In addition to identifying PRPs, the Trustees have sought to evaluate and quantify the natural resource injuries in order to determine an appropriate method of allocating liability among the PRPs.  The Trustees implemented a complex and multi-faceted process for allocating liability (and for allocating assessment costs) for the purpose of obtaining settlements with the PRPs.  For the sake of brevity, the Court summarizes this process.

The process can be summarized in four basic steps.  First, the Trustees identified the range of natural resource injuries that were caused by contamination of the Bay.  The injuries were measured in terms of losses of ecological services provided per acre of affected habitat. Specifically, the Trustees determined the percentage loss of ecological services resulting from increasing concentrations of hazardous substances.

Second, the Trustees calculated the amount of habitat restoration that was needed to compensate for each respective natural resource injury.  The natural resource damage for a

---

[2]/    This Revised Settlement Proposal was not included in the record before the Court.

particular area was then gauged in a quantifiable unit – the discounted ecological service acre-year (DSAY). The DSAY was used to describe both the scale of injuries, and the amount of habitat the Trustees were seeking to compensate for the injuries. The Trustees have estimated that the natural resource injury at the Hylebos Waterway is approximately 1526 DSAYs.

Third, the Trustees distributed the 1526 DSAYs among the individual parcels of land upon which industrial activity had at some point contributed to the contamination of the Waterway. To assign a specific number of DSAYs to a particular parcel, the Trustees first allocated the DSAYs known to have come directly from that parcel. The Trustees then distributed among all the parcels the remaining DSAYs that could not be traced specifically to a particular parcel.

Because many land parcels were occupied by different entities over the years, the fourth step in allocating liability was to assign DSAYs to each PRP that was responsible for the respective parcel at some point in time. For that process, the Trustees retained Matt Low of TLI Systems, who submitted a report ("Low Report") which allocated liability to individual PRPs. Todd claims that it did not received a copy of the Low Report.[3]/ Dkt. 10, at 8.

According to Plaintiff, Low reviewed "extensive factual disclosures by the parties…and relied heavily upon information about which parties were engaged in different activities at different times." *Id.* Low's formula for allocating liability consisted of multiplying a Release Magnitude (RM) score, a Sediment Quality Objective (SQO) score, and the number of years of operation of an activity. The RM score takes into account the nature and magnitude of releases containing contaminants of concern. The Trustees relied in part on this report in allocating liability to PRPs for specific parcels, and used Low's RM and SQO scores, except where noted.

Where the ownership and operation of a facility were split between different parties, the Trustees followed Low's approach of dividing the RM score 80:20 between the operator and the

---

[3]/   The Court was not provided a copy of the Low Report.

owner. The party totals per facility were summed, and the percent that each party's score bears to the total facility score was calculated. That party percent was multiplied times the DSAYs assigned to the facility for each substance of concern (SOC) with which the party was involved. The total of DSAYs thus assigned to a party for all SOCs was summed for a party-specific site DSAY sub-allocation. *See* Dkt. 10.

The Trustees allocated DSAYs as a means to encourage PRPs to resolve their liability by constructing habitat restoration projects. For parties who preferred to settle on a cash-damages basis, the Trustees valued each DSAY at $52,000.00. A party who wished to settle by paying cash could pay the value of the allocated DSAYs, plus damage assessment costs. Dkt 5-2, at 6-7.

### C. AK-WA Site and Todd's Involvement

Among the identified sites on the Waterway, the Trustees identified the AK-WA Shipbuilding site as the most significant in terms contributing to the contamination of the Waterway. Todd Shipyard's involvement as a PRP arises out of Todd's manufacturing of ships on the AK-WA Shipbuilding site.[4] The United States involvement in the alleged environmental damage stems from its connection through various federal agencies to the AK-WA site, as well as six other industrial facilities that were located along the Waterway.

Beginning in approximately 1917, this site and its adjacent waters were used for shipbuilding. During World War I, Todd (or one of its predecessors) built a shipyard on this site. In 1917, after the United States declared war, the Shipping Act of 1916 provided authority for the formation of the United States Shipping Board and Emergency Fleet Corporation. From September 1917 to June 1919, the Tacoma Shipyard produced merchant freighters under contract with the U.S. Shipping Board for the Emergency Fleet Corporation, and completed scout cruisers

---

[4]/   The Trustees also allocated DSAYs to Todd for its involvement for at least one other site.

for the U.S. Navy. After the war, the Shipyard produced three ships under private contract. The Shipyard then closed in 1924, and remained dormant until 1939.

In 1939, Todd entered into joint-venture and was awarded a contract by the United States through the Maritime Commission to produce freighters. In 1940, Todd contracted with General Construction Company to build the infrastructure necessary for Todd to build warships and vessels. From 1939 to 1946, Todd built five freighters for the Maritime Commission, and 74 ships for the U.S. and British navies.

Shipbuilding at the site ceased after the war. In 1946, the site was designated part of the U.S. Naval Station, Tacoma. In 1948, the United States purchased the site for use by the Navy. The Navy conducted ship berthing, maintenance and other activities from 1948-1960, and the site was sold to the Port of Tacoma in 1960.

Of the 455.215 DSAYs that were assigned to the AK-WA site, the United States was assigned 186.52 DSAYs and Todd was assigned 54.77 DSAYs. *Id*., at 12. The United States agreed to pay $9,699,258.40 in liquidated damages, plus $1,076,121.60 in assessment costs (for a total of $10,775,280.00) to settle with the Plaintiffs for natural resource injuries occurring at this site. Dkt. 10, at 25. The remainder of the amount that the United States has agreed to pay in the Consent Decree results from natural resource damages occurring at other sites.

### D. Proposed Consent Decree

The plaintiffs and defendant filed a Consent Decree with the Court on May 8, 2006. Dkt. 5-2. While the investigation into the environmental damage was not yet finalized, the parties determined that the damage assessment was sufficient to support a settlement. Dkt. 5-2, at 5. Settling federal agencies agreed to pay Plaintiffs the equivalent of 234.324 DSAYs plus damage assessment costs, totaling $13,356,760.33. The fairness and reasonableness of this allocation of DSAYs to the United States is in dispute in this matter.

Two other provisions of the Consent Decree are also in dispute: (1) the provision stating that the decree "shall not be used as evidence against any Party in any action or proceeding other than an action or proceeding to enforce the terms of this Consent Decree" (Dkt. 5-2, at 9, lines 22-23), and (2) the provision that protects the United States from "contribution actions or claims as provided by CERCLA...for matters addressed in this Consent Decree" (Id., at 13, lines 4-10).

### III.  PLAINTIFF'S MOTION TO ENTER CONSENT DECREE

Plaintiffs received one comment regarding the proposed Consent Decree, from Todd Shipyards.  Todd objects to the Consent Decree, arguing that: (1) the consent decree was not procedurally fair; (2) the consent decree was not substantively fair; (3) the liability allocated to the United States was unreasonably low because the United States was contractually obligated to defend and indemnify Todd for all claims and damages, and because the United States exercised complete control over Todd's facilities during the war effort; and (4) the United States should not be granted complete contribution protection.  Dkt. 8-2.

Plaintiffs filed a Motion to Enter Consent Decree and responded to Todd's comment.  Plaintiff's argue that (1) the settlement process was procedurally and substantively fair; (2) Todd was the operator of the AK-WA site, and there is no evidence of pervasive control that supports Todd's contention that the United States should be 100% liable; (3) the United States was allocated a fair percentage of liability; and (4) Todd's concerns regarding the indemnity contract provision are irrelevant, as Todd has preserved its ability to advance an indemnity defense in any future actions.  Dkt. 8.

Also at issue is the Consent Decree provision stating that the decree may not be used in future actions.

### A. Proposed Consent Decree

CERCLA was enacted to facilitate "expeditious and efficient cleanup of hazardous waste sites." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001). Its secondary purpose is to hold responsible parties accountable for cleanup efforts. *Id.* CERCLA accomplishes these goals by imposing strict liability on owners and operators of facilities where releases of hazardous substances occur. *Id.* at 870. This liability is joint and several, subject to statutory defenses set forth in 42 U.S.C. § 9607(b). *See California v. Montrose Chemical Corp. of California*, 104 F.3d 1507, 1518 n. 9 (9th Cir. 1997).

In deciding whether to approve a CERCLA settlement, the reviewing court's role is to "scrutinize" the settlement, but the acting governmental units are entitled to some deference. *Montrose*, 50 F.3d at 747. When "faced with consent decrees executed in good faith and at arm's length between the EPA and counseled polluters, [district courts] must look at the big picture, leaving interstitial details largely to the agency's informed judgment." *U.S. v. Cannons Engineering Corp.*, 899 F.2d 79, 94 (1st Cir. 1990), cited with approval in *Montrose*, 50 F.3d at 746. Courts evaluate settlements on the basis of three, non-mutually exclusive criteria: (1) reasonableness, (2) fairness, and (3) consistency with CERCLA's purposes. *See Montrose*, 50 F.3d at 743; *Cannons Engineering Corp.*, 899 F.2d at 90.

**1. Fairness**

Fairness has procedural and substantive components. *Montrose*, 50 F.3d at 746 ("(1) the product of a procedurally fair process, and (2) substantively fair to the parties in light of a reasonable reading of the facts"). Courts should evaluate the fairness of the consent decree from the standpoint of non-settling defendants, but the effect on such defendants is not determinative. *Cannons Engineering Corp.*, 720 F.Supp. at 1040.

### a. Procedural Fairness

In measuring procedural fairness, "a court should ordinarily look to the negotiation process and attempt to engage its candor, openness, and bargaining balance." *Cannons*, 899 F.2d at 86 (citations omitted). Todd challenges the procedural fairness of Plaintiff's settlement process on several grounds.

Todd first argues that the settlement process was not procedurally fair because "the federal government was on both sides of the negotiating table." Dkt. 8-2, at 11-13. Todd notes that the Consent Decree was drafted by the NOAA, the federal trustee, and characterizes the settlement as a "sweetheart deal." *Id.*

Todd next argues that while the Trustees used a relatively open and fair process to develop the settlement process, the final settlement offer was deficient because the Trustees did not provide a sufficient rationale for the Revised Settlement Proposal. According to Todd, the process was procedurally unfair because Todd was not given an adequate opportunity to comment. Todd argues that it was not able to provide "any meaningful comment" because the Trustees did not propose any allocation of DSAYs among the allegedly responsible parties. *Id.*

At oral argument, Todd stated that documents explaining the basis for the settlement were not provided until Plaintiff's September 2007 filing with this Court. Todd specifically objects the Trustee's method of sub-allocating the liability assigned to each land parcel to the United States and Todd. By not providing a copy of the Low Report, Todd argues that this Court is not able to independently evaluate the fairness of the settlement.

Finally, Todd claims to have tendered a defense of the Trustee's claims to the United States and did not receive a response. Dkt. 8-2, at 2.

Plaintiff contends that the settlement was procedurally fair. Dkt. 8, at 11-13. Plaintiff first argues that the settlement process was open and PRPs were notified about opportunities to

provide input, and Todd chose not to participate. *Id.* Plaintiff further contends that the procedure was fair because the Trustees relied on a disinterested third party to allocate liability to PRPs. *Id.* Finally, Plaintiff rejects Todd's claim that the settlement process was a "sweetheart deal" because the Trustees engaged in an open analysis with participants from state, federal, and tribal governments, and Todd has not pointed to any evidence in the record that indicates that a conflict of interest existed that tainted the settlement process. *Id.*, at 20-21.

### Conclusion

The Court concludes that the proposed consent decree was procedurally fair. The parties engaged in a settlement process that was open and fair, and invited the PRPs to participate in the settlement negotiation process. The parties involved included not just federal government agencies, but also state and tribal governments, as well as a disinterested third party. Todd was provided opportunities to attend hearings and submit settlement proposals, but elected not to participate in the process. While the United States should have responded to Todd's tendering of a defense, this failure on the part of the United States does not make the consent decree procedurally unfair. If the United States files an action against Todd, the tendered defenses will be available to Todd.

Plaintiff's failure to provide a copy of the Low Report to Todd is not fatal to the procedural fairness of the proposed consent decree. It is appropriate, however, for PRPs to request detailed reports, and upon request, plaintiffs should provide such reports.

**b. Substantive Fairness**

With regard to substantive fairness, "settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done. *Cannons Engineering Corp.*, 899 F.2d at 87. There is no universal method for

measuring comparative fault, and the appropriate measure depends upon the factual circumstances. *See id.* Courts should uphold the governmental unit's formula for measuring comparative fault and allocating liability if the "agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs." *Id.* The reviewing court must afford deference to an agency's settlement, but the true measure of deference depends upon the persuasiveness of the agency's proposal and rationale. *Montrose*, 50 F.3d at 746. In other words, the agency's allocation of fault should be upheld unless it is "arbitrary, capricious, and devoid of a rational basis." *Cannons Engineering Corp.*, 899 F.2d at 87.

One method of assessing comparative fault is to determine the proportional relationship between (1) the amount of money to be paid by the settling defendant and (2) the government's estimate of total potential damages. *Montrose*, 50 F.3d at 747. Courts may consider the ability of the government to collect from non-settling defendants and may include reasonable and justifiable discounts, such as for litigation risks and time savings. *Id.*

Todd requests that the Court reject the proposed Consent Decree, alleging that the United States was held liable for an unreasonably small portion of the natural resource damage. Dkt. 8-2, at 13-14. Todd argues that the Trustees unfairly allocated only 22% of the alleged resource damage to the United States for the AK-WA site. *Id.* In addition, Todd argues that the settlement proposal did not hold the United States liable for any natural resource damage for activities at the AK-WA site that took place during World War I. *Id.* At oral argument, Todd expressed concern about the prospect of being held liable for more than Todd's "fair share" if the government settles for less than the government's fair share.

Plaintiff's response to Todd's allegations are outlined in Section 1(c) below.

**c. Reasonableness**

The determination of whether a settlement is reasonable is a "multifaceted exercise" requiring consideration of several factors: the nature and extent of the hazards at the cleanup site; the degree to which the consent decree will adequately address the hazards at the cleanup site; the possible alternative approaches for remedying the hazards; the extent to which the consent decree furthers the goals of the statutes that form the basis of the litigation; the extent to which the consent decree compensates the pubic for actual and anticipated response cost;  the extent to which the consent decree is in the public's interest; and the relative strengths of the parties' litigating positions. *Cannons Engineering Corp.*, 720 F.Supp. at 1038.

To determine whether a settlement is reasonable, courts may consider the extent to which the settlement is in the public interest.  *Id.*  A settlement should satisfactorily compensate the public for both actual and anticipated costs of remedial and response measures.  *Cannons*, 899 F.2d at 90.  Resolution of this question "can be enormously complex."  *Id.*  The EPA need not demonstrate "mathematical precision," and courts defer to the EPA "[i]f the figures relied upon derive in a sensible way from a plausible interpretation of the record."  *Id.*

Todd argues that the Consent Decree is not reasonable because the United States should be allocated 100% liability for whatever natural resource damages are attributable to its operation of the shipyard.  Dkt. 8-2, at 15.  Todd contends that the United States is 100% liable because it was contractually obligated to defend and indemnify Todd for all claims and damages associated with the shipyard activities during the government's control, and because the United States exercised complete control over the shipyard facilities in pursuit of the war effort. *Id.*

At oral argument, Todd also argued that the existence of the contractual indemnity provision was a relevant equitable factor that was not considered by the Trustees in allocating liability to the PRPs.  Todd further argued that in addition to situations where the government has

pervasive control over a site, cases where parties have had similar indemnification provisions have persuaded some courts to allocate 100% liability to the government.

Plaintiffs contend that the Consent Decree is reasonable, and that the allocation of liability was conducted in a fair and reasonable manner. Dkt. 8. Plaintiffs contend that the damage assessment process described in the Consent Decree[5]/, as well as declarations filed in Court, adequately and fairly allocated liability among the PRPs. Plaintiffs further assert that Todd, and not the United States, was the "operator" of the AK-WA site, and is thus jointly and severally liable under CERCLA for natural resource damages. *Id.* at 17. Finally, Plaintiffs argue that the existence of an indemnification provision in Todd's contract with the United States is irrelevant, as Todd may submit this defense in any future action. *Id.*, at 22. In other words, Plaintiffs argue that this contractual issue is not ripe.

## Conclusion

The Court concludes that the settlement agreement in the consent decree is substantively fair and reasonable. The consent decree does not preclude Todd from advancing its defenses should Todd face a lawsuit in the future. The Plaintiffs and the United States engaged in a settlement process in good faith, and the acting governmental units that supervised and implemented the damage assessment analysis are entitled to deference under the provisions of CERCLA. The parties have provided detailed reports and declarations that sufficiently support a finding that the settlement agreement reached by the parties was substantively fair and reasonable.

The damage assessment process need not demonstrate mathematical precision, and the Court need not determine whether it would have assessed the same damages as the settling parties. For purposes of approving the substantive aspects of the Consent Decree, the Court is satisfied that the settling parties relied upon the damage assessment analysis in a sensible manner

---

[5]/    See Section B of the Factual Background section above.

and that the settlement reasonably compensates the public for the natural resource damages at Commencement Bay.

**2. Contribution Provision and Todd's Contractual Indemnity Clause**

"A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2).

Todd objects to the complete contribution protection provided by the proposed Consent Decree on two grounds. First, the payments that the United States would make under the decree are inadequate to warrant immunizing them from further liability. Second, the United States has not resolved its liability in a manner that would justify protection against contribution claims made by Todd in the future. Todd argues that contribution protection is not warranted because the United States ignored Todd's tendering of a defense, and refused to enter into a discussion with Todd to resolve its claims against the United States for contractual, equitable and statutory indemnification and contribution. Dkt. 8-2.

At oral argument, Todd requested that, at a minimum, the contribution provision in the Consent Decree be amended to include a sentence that makes clear that contractual indemnity claims are not barred by the Consent Decree.

Plaintiffs respond to Todd's objections, and contend that the contribution provision is a standard provision included in most CERCLA consent decrees. Plaintiffs addressed Todd's objections to the amount of liability allocated to the United States in response to arguments discussed in Section 1 above.

The parties appear to be in agreement that the contribution provision is not intended to bar any future claims for contractual indemnity against the United States.

**Conclusion**

The consent decree is reasonable and substantively fair.  Under CERCLA, the settling parties may include a provision that protects the United States from contribution.  As stated above, Todd is not precluded from advancing its defense in any future actions.

The parties and Todd appear to agree that the contribution provision does not preclude Todd from seeking to enforce the contract indemnity clause in any future lawsuit.  The parties should either amend the body of paragraph 18 of Section XII (Dkt. 5-2, at 13, lines 4-10) to include explicit language stating that the contribution protection provision does not preclude such a defense, or Defendant and Todd should execute a separate agreement that clarifies this issue.  The acceptance by this Court of the Consent Decree is conditioned on one of these options being satisfied.

**3. Provision Precluding the Use of the Consent Decree as Evidence in Future Proceedings**

Paragraph 6 of Section VI states, "[t]his Consent Decree shall not be used against any Party in any action or proceeding other to enforce the terms of this Consent Decree." Dkt. 5-2, at 9, lines 22-23.

Plaintiffs and the United States have provided no legal authority that this provision is enforceable.  The Court notes that the Consent Decree already contains a provision precluding the use of the Consent Decree as evidence of an admission of liability on the part of the United States.  *Id.*, lines 19-21.  The parties have not provided an explanation as to why the broad restriction on the use of the Consent Decree as evidence as provided in paragraph 6 is necessary.

The Court cannot and should not prohibit the use of the Consent Decree in future actions.  The Consent Decree is part of the record accessible by the public, and the Court is aware of no legal authority, or for that matter any sensible public policy, that supports preventing the use of the Consent Decree by parties in future actions.  The rules and laws of evidence will guide any court hearing any future case.  The acceptance by this Court of the Consent Decree is conditioned

on the removal of this provision.

## IV. SUMMARY AND ORDER

The consent decree is fair and reasonable, with the exception of the contribution and evidence provisions. The Court declines to enter the Consent Decree in its present form, but will enter the Consent Decree when the issues involving these two provisions are resolved as set out above. It appears to the Court that neither modification requested by the Court constitutes a substantive change to the Consent Decree, and thus no renotification period should be required. The parties have met the notice requirements under CERCLA and the public was afforded an opportunity to comment. The parties should file a modified Consent Decree, or otherwise advise the Court, on or before November 13, 2007.

IT IS SO ORDERED.

DATED this 15th day of October, 2007.

*Robert J. Bryan* (signature)

ROBERT J. BRYAN
United States District Judge